## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ANTOINETTE ROGALSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     No. 4:13 CV 117 DDN |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Antoinette Rogalski for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 14.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Antoinette Rogalski, born March 20, 1962, filed an application for Title II and Title XVI benefits on November 14, 2008. (Tr. 187-97.) She alleged an onset date of disability of April 12, 2008, due to nerve damage in the legs, dizziness, bowel incontinence, low back pain, and left side swelling. (Tr. 235.) Plaintiff's applications were denied initially on February 19, 2009, and she requested a hearing before an ALJ. (Tr. 58-69.)

---

[1] When plaintiff commenced this action, the named defendant was Michael J. Astrue, Commissioner of Social Security. On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

On April 21, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 22-27.) On October 20, 2010, the Appeals Council denied plaintiff's request for review, and she appealed to the district court. (Tr. 1-3.) On November 28, 2011, the district court reversed and remanded the case for further proceedings. (Tr. 472-87.)

On April 19, 2012, following a second hearing, the ALJ again found plaintiff not disabled. (Tr. 403-13.) On November 14, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 395-97.) Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On May 18, 2004, Carlos M. Yu, II, M.D., evaluated plaintiff regarding her complaint of right foot pain. Two years earlier, plaintiff slipped on a wet floor in her home and fell on her right foot. Her foot became swollen, and she went to the emergency room and received an ankle sprain diagnosis. She complained of swelling and pain on the top and bottom of her foot, and the pain increased about one month earlier. A nerve conduction study and MRI of her foot revealed no abnormalities. Her medications included Allegra.[2] She was married with three children, smoked cigarettes, and worked at a doughnut shop. (Tr. 171-72.)

During the examination, she measured five feet, three inches and 230 pounds. She walked with a normal gait but favored her right foot. Dr. Yu observed her foot as red and swollen with tenderness on the top and bottom. He found no evidence of a neurological disorder. He suspected reflex sympathetic dystrophy and recommended that she see pain management for a sympathetic nerve block.[3] (Id.)

On September 19, 2007, plaintiff complained of coughing and congestion and reported receiving antibiotics from the emergency room. She continued to smoke cigarettes. She also complained of neck pain and of anger regarding the death of her spouse. John Rice, M.D., described her lungs as clear. He assessed upper respiratory infection or allergic rhinitis, muscular

---

[2] Allegra is an antihistamine used to relieve allergy symptoms. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[3] A sympathetic nerve block is the blocking of a group of nerves causing pain to determine damage to the sympathetic nerve chain. WebMD, http://www.webmd.com/pain-management/guide/nerve-blocks (last visited on February 10, 2014).

neck strain, and major depression.  He prescribed Rhinocort, recommended stretching, and continued Effexor.[4]  (Tr. 284.)

On October 2, 2007, plaintiff complained of dysuria, pelvic discomfort, throat pain, and left flank pain.  Dr. Rice recommended a urinalysis and prescribed Cipro.[5]  (Tr. 283.)

On April 10, 2008, plaintiff arrived at the emergency room, complaining of dizziness and memory loss during the previous two weeks.  Peter M. Gardiner, M.D., diagnosed chronic sinusitis and prescribed Claritin.[6]  (Tr. 303-05.)

On April 16, 2008, plaintiff reported foreclosure and eviction on her residence and that she retained counsel.  She complained of anxiety attacks, the inability to concentrate, and high blood pressure.  She requested medication for her anxiety.  Dr. Rice prescribed Xanax and Lexapro.[7]  (Tr. 282.)

On May 20, 2008, plaintiff arrived at the emergency room, complaining of body aches, vomiting, and diarrhea.  An abdominal CT scan revealed caliectasis and urothelia thickening, adrenal mass, hepatic cysts, uterine leiomyomatosis, and bilateral L5 pars interarticularis defects with grade II spondylolisthesis of L5 and S1 with degenerative disc disease at L5-S1.[8]  Dr.

---

[4]  Rhinocort is used to treat nose inflammation.  WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).  Effexor is an antidepressant.  Id.

[5]  Cipro is used to treat bacterial infection.  WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[6]  Claritin in an antihistamine that treats the symptoms of hay fever and other allergies.  WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[7]  Xanax is used to treat anxiety and panic disorders.  WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).  Lexapro is an antidepressant.  Id.

[8]  The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 22117-18 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

Gardiner diagnosed fever, chills, abdominal pain, and urinary tract infection. He prescribed Cipro and Reglan.[9] (Tr. 306-16.)

On June 20, 2008, plaintiff complained of stress, inability to sleep, and crying and reported that her employer, Schnucks, had allowed her to take medical leave. Dr. Wahba observed that plaintiff had a strong preoccupation with her eviction and that she claimed that she captured the scene on camera. She reported declaring bankruptcy, that she lost her home, and that the sheriff mistreated her during her eviction. She also reported that her spouse died three years earlier and that her mother died two years earlier. She stated that she worked as a baker from the age of fifteen until one year earlier. He assessed major depressive disorder and assessed a GAF score of 55.[10] He also prescribed Lexapro. (Tr. 119-20.)

On July 1, 2008, plaintiff met with Paul K. Robb, Psy. D., for a therapy session. She reported that her spouse died of lung cancer and that she sued his physicians for medical malpractice. She further reported that one year later her mother died of leukemia. (Tr. 328.)

On July 11, 2008, plaintiff reported that she saw no reason to live but that she did not feel suicidal. Dr. Wahba assessed depression and anxiety and prescribed Celexa.[11] (Tr. 188.)

On July 27, 2008, plaintiff complained of dizziness, crying, depression, and anxiety attacks. She further reported that Celexa caused drowsiness. Dr. Wahba allowed plaintiff to refrain from working for two more weeks. Dr. Wahba replaced Celexa with Lexapro. (Tr. 116.)

On August 1, 2008, plaintiff met with Dr. Robb for a therapy session. She reported that she had to take water pills and that she felt weak and cried. She also reported a television

---

[9]   Reglan is used certain stomach and intestinal conditions. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[10] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
    On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM").

[11] Celexa is an antidepressant. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

interview and United States Congressman Lacy Clay's involvement with her foreclosure and eviction. (Tr. 327.)

On August 8, 2008, plaintiff met with Dr. Robb for a therapy session. She reported the following. Her daughter informed her that her aunt died. Her sleep patterns have changed, and she trembles. She fell in a doughnut shop eight years earlier and has pain in her left leg. She has lost twenty pounds since May due to lack of appetite. Her dog suffered seizures and recently died. (Tr. 326.)

On August 10, 2008, plaintiff arrived at the emergency room, complaining of left leg pain that began two days earlier. Scott L. Landry, M.D., prescribed Medrol and Percocet and diagnosed sciatica.[12] (Tr. 299-302.)

On August 11, 2008, plaintiff complained of anxiety and reported that she lived with her daughter. Dr. Satish Kulkarni, M.D., observed that she did not respond to Lexapro. He assessed major depressive disorder and replaced Lexapro with Cymbalta.[13] (Tr. 115.)

On August 15, 2008, plaintiff entered into the Center Pointe Hospital intensive outpatient program due to depression, crying spells, increased anxiety, racing thoughts, and feeling hopeless and helpless. She also experienced stress at the workplace. She cooperated with her treatment program and participated in several therapy groups. She was discharged on August 27, 2008, and her prescriptions included Cymbalta, Seroquel, and Lexapro.[14] Her diagnoses included severe, recurrent, major depressive disorder, and she received a GAF score of 40.[15] (Tr. 259-74.)

On September 2, 2008, plaintiff complained of depression but stated that she felt better. She further complained of pain from her left buttock down her left leg and reported that she went

---

[12] Percocet is used to alleviate pain. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014). Medrol is used to reduce certain symptoms, including swelling, pain, and allergic reactions by suppressing the immune system. Id.

[13] Cymbalta is an antidepressant. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[14] Seroquel is used to treat certain mental or mood conditions, including schizophrenia and bipolar disorder. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[15] GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). DSM–IV–TR at 32–34.

to the emergency room and received a prescription for prednisone but did not fill it.[16]  Dr. Rice observed an abnormal gait.  He assessed slow improvement with depression and left-sided sciatica.  He further recommended that she return to work to improve her mental health.  (Tr. 281.)

On September 4, 2008, plaintiff met with Dr. Robb for a therapy session.  She reported that she attended group therapy, which she found helpful.  She had lost fifty-five pounds since the previous May.  She complained of crying, isolating, lack of appetite, nausea, sciatica, racing thoughts, anxiety, and sleep disturbances.  She requested an additional weekly therapy session. (Tr. 325.)

On September 10, 2008, plaintiff complained of edginess, hot flashes, poor sleep, and shortness of breath.  Dr. Kulkamari observed an anxious mood but good insight and judgment. He assessed bipolar disorder and increased her Seroquel dosage.  (Tr. 114.)

On October 1, 2008, plaintiff complained of chronic pain and her struggles with returning to work.  Dr. Kulkamari observed angry, anxious mood and good insight and judgment.  He increased her Cymbalta dosage.  (Tr. 113.)

On October 15, 2008, plaintiff reported that she continued to struggle with returning to work, poor sleep, and lack of appetite.  Dr. Kulkamari noted that she refused to see her primary care provider.  He observed an angry, anxious mood and good insight and judgment.  (Tr. 112.)

On October 23, 2008, plaintiff complained of left leg pain that began three months earlier. She described the pain as sharp and radiating from her left hip to her ankle.  She reported swelling and some difficulty bearing weight.   She further complained of back pain, episodes of bowel incontinence, and heavy menstrual bleeding.  She reported the loss of ninety pounds over six months and that she smoked one pack of cigarettes per day.  Joelle Biernacki, M.D., found a low left leg ultrasound to be normal and without evidence of deep venous thrombophlebitis.  Daniel T. Mattson, M.D., considered deep vein thrombosis and recommended a nerve conduction study,

_____

[16] Prednisone is used to reduce certain symptoms, including swelling and allergic reactions, by suppressing the immune system.  WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

spinal MRI scan, abdominal CT scan, and appointments with gynecology and her primary care provider. He prescribed Neurontin.[17] (Tr. 169-70, 174.)

On October 27, 2008, plaintiff complained of lack of appetite and crying spells. Dr. Kulkamari observed angry, anxious mood and good insight and judgment. (Tr. 111.)

Also on October 27, 2008, an abdominal CT scan revealed resolution of left-sided pyelonephritis but no change with the adrenal mass, hepatic cysts, or myomatous uterus. It also revealed bilateral L5 pars interarticularis defects with Grade I spondylolisthesis at L5 and S1 and degenerative disc disease at L5-S1. Spinal MRI scans revealed reversal of normal cervical lordosis, moderate spondylosis or disc spur complex at C3-C4 and C4-C5, mild spondylosis or disc spur complex at C5-C6 and C6-C7, and mild disc spur complex at C7-T1 with mild thecal sac compression. They also revealed disc protrusion or herniation at T5-T6 with mild compression of the thecal sac and thoracic cord, moderate disc spur complex at T9-T10 with flattening of the thecal sac and thoracic cord, desiccated disc with minimal Grade I anterolisthesis at L5 and S1, and moderate disc bulge or disc spur complex at L1-L2 with mild flattening of the thecal sac. (Tr. 334-39.)

On November 13, 2008, Dr. Mattson noted that plaintiff's spinal MRI scans revealed multilevel degenerative disease with no direct compression and that her abdominal CT scan revealed an enlarged uterus but with no significant mass or evidence of malignancy. Plaintiff complained of continued pain and reported an earlier diagnosis of irritable bowel syndrome. Dr. Mattson found a nerve conduction study of plaintiff's legs to be unremarkable. He referred her to pain management. (Tr. 167-68, 175-79.)

On December 2, 2008, an ankle-brachial index test revealed no evidence of resting arterial insufficiencies in either leg. A brain CT scan revealed no parenchymal brain lesion. (Tr. 173, 180.)

On January 14, 2009, plaintiff complained of ongoing hip pain. Dr. Mattson noted that plaintiff missed her appointment with pain management and that her imaging studies were unremarkable. He described her as neurologically stable and again referred her to pain management. (Tr. 165-66.)

---

[17] Neurontin is used to prevent and control seizures and for nerve pain relief. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

On January 17, 2009, plaintiff arrived at the emergency room, complaining of burning chest pain. Chest X-rays revealed no acute pulmonary disease. Betty R. Varghese, M.D., diagnosed atypical chest pain, acute conjunctivitis, and acute bronchitis. (Tr. 157-63.)

On February 11, 2009, Nancy Dunlap submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. She found that plaintiff could occasionally lift more than twenty pounds, frequently lift more than ten pounds, stand or walk for about six hours during an eight-hour workday, and sit for about six hours. (Tr. 361-66.)

On February 17, 2009, Ricardo Moreno, Psy.D., submitted a Psychiatric Review Technique form. He found that plaintiff's medically determinable impairments included depression and bipolar disorder. He further found that plaintiff had moderate restriction of daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties with concentration, persistence, and pace, and one or two repeated extended episodes of decompensation. (Tr. 361-66.)

Also on February 17, 2009, Dr. Moreno submitted a Mental Residual Functional Capacity Assessment form. He found that she had moderate limitations with remembering locations and work procedures and with understanding and remembering detailed instructions. He further found that she had moderate limitations with the performing detailed instructions, maintaining energy and concentration for long periods, performing activities on a regular schedule, sustaining an ordinary routine without supervision, working in coordination with other people, and working a normal work schedule without unreasonable interruptions. Additionally, he found that plaintiff suffered had moderate limitations with interacting appropriately with coworkers, supervisors, and the general public and maintaining socially appropriate behavior. He also found that she had moderate limitations with responding appropriately to work changes, awareness of hazards and necessary precautions, travelling to unfamiliar places or using public transportation, and independently planning. Dr. Moreno concluded that plaintiff retained the ability to understand, remember, and perform simple instructions. (Tr. 378-80.)

On February 26, 2009, plaintiff arrived at Christian Hospital, stating that she lost her medical insurance and that her former doctor did not accept Medicaid. Her medications included azithromycin, ciprofloxacin, ranitidine, and tussinex suspension.[18] (Tr. 133.)

On March 5, 2009, plaintiff left insurance and Family and Medical Leave Act forms with Christian Hospital. (Tr. 152.)

On April 6, 2009, plaintiff arrived at Christian Hospital, following up after an emergency room visit. She reported X-ray scans of her chest and ribs. (Tr. 132.)

On April 14, 2009, plaintiff complained of flu-like symptoms, including aching ribs and chills. (Tr. 131.)

On April 20, 2009, an abdominal CT revealed a bulky uterus, small opaque calculus in the gallbladder, an adrenal mass, and hepatic cysts. (Tr. 128-30.)

On May 11, 2009, plaintiff complained that she had the flu. Michael Spezia, M.D., diagnosis of upper respiratory infection. (Tr. 127.)

On June 10, 2009, plaintiff complained of a sinus infection. (Tr. 126.)

On June 22, 2009, plaintiff arrived at the emergency room. Yolanda A. Acklin, ANP, diagnosed acute frontal sinusitis and cerumen impaction. She received a prescription for Augmentin.[19] Wenzel Vas, M.D., found a lung X-ray to be negative. (Tr. 142-49.)

On July 15, 2009, a maxillofacial CT scan revealed ethmoid and right maxillary sinusitis with complete opacification of the right antrum. (Tr. 150.)

On July 18, 2009, plaintiff arrived at the emergency room. William C. Carr, M.D., diagnosed urinary tract infection, endometriosis, and lumbar degenerative disc disease. He prescribed Levaquin.[20] (Tr. 137-41.)

---

[18] Azithromycin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014). Ciprofloxacin is also known as Cipro. Id. Ranitidine is used to prevent and treat heartburn. Id. Tussinex is used to treat coughs and other symptoms of allergies and the common cold. Id.

[19] Augmentin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[20] Levaquin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

On July 21, 2009, plaintiff arrived at Christian Hospital to follow up her emergency room visit. (Tr. 136.)

On August 18, 2009, plaintiff arrived at Christian Hospital with paperwork for disability benefits and for a checkup. (Tr. 124.)

On August 29, 2009, plaintiff arrived at Christian Hospital and complained of left leg pain. (Tr. 123.)

On September 23, 2009, plaintiff requested medication for cellulitis. Dr. Spezia prescribed Cipro. (Tr. 135.)

On October 8, 2009, plaintiff arrived at Christian Hospital with paperwork. (Tr. 122.)

On October 26, 2009, plaintiff complained of urinary tract infection. Dr. Spezia prescribed Macrodantin.[21] (Tr. 694.)

On December 21, 2009, plaintiff complained of shooting right knee pain and numbness, which began after she heard it pop. (Tr. 692.)

On January 18, 2010, plaintiff complained of general swelling. Dr. Spezia ordered an MRI scan of her right knee. (Tr. 691.)

On January 21, 2010, plaintiff arrived at Christian Hospital, complaining of flank pain and unresolved urinary tract infection. She was admitted and received fluids, antibiotics, analgesics, anti-inflammatory agents, and muscle relaxants for her pain. Dr. Spezia diagnosed urinary tract infection, lumbosacral spine dysfunction, lumbar myositis, obesity, and lumbar radiculopathy. He continued her on ranitidine, vicodin, and Flexeril and prescribed Naprosyn.[22] He further prescribed physical therapy and scheduled an MRI scan. (Tr. 688.)

On January 24, 2010, spinal CT scans revealed Grade I to Grade II spondylolisthesis at L5-S1 with face osteoarthritis. (Tr. 684.)

On February 4, 2010, a right knee MRI scan revealed tricompartmental osteoarthritis and possible small osteochondral defect. (Tr. 689-90.)

---

[21] Macrodantin is used to treat or prevent certain urinary tract infection. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[22] Flexeril is used short-term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014). Naprosyn is used to relieve pain by blocking the body's production of inflammation-causing substances. Id.

On April 24, 2010, plaintiff arrived at Christian Hospital and complained of a urinary tract infection. (Tr. 683.)

On May 8, 2010, plaintiff arrived at Christian Hospital to follow up on a possible kidney or bladder infection and to discuss an injection into her knee. (Tr. 682.)

On June 8, 2010, plaintiff arrived at Christian Hospital and complained of a kidney infection. (Tr. 681.)

On August 9, 2010, plaintiff arrived at Christian Hospital and complained of the flu and toothache. (Tr. 680.)

On September 23, 2010, plaintiff complained of a swollen left jaw. She had been taking hydrochlorothiazide and received a pain shot.[23] (Tr. 678.)

On September 25, 2010, plaintiff arrived at the emergency room, complaining of a toothache. Her medications prior to arrival included Celexa, hydrochlorothiazide, Darvocet, chlorhexidine gluconate, and naproxen.[24] Laura L. Snyder, PA-C, diagnosed toothache and atypical facial pain and prescribed amoxicillin.[25] (Tr. 580-99.)

On November 22, 2010, plaintiff arrived at Christian Hospital, complaining of left leg pain and urinary tract infection. (Tr. 677.)

On March 27, 2011, plaintiff arrived at the emergency room, complaining of chills, urinary tract infection, aches, and a sore throat. Chest X-rays revealed borderline cardiomegaly. Vickie J. Caril, ANP, diagnosed acute bronchitis, acute pharyngitis, and urinary tract infection. She prescribed Cipro, Pyridium, Phenergan, and Zithromax.[26] (Tr. 602-26.)

---

[23] Hydrochlorothiazide is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[24] Darvocet was used to treat pain. WebMD, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (last visited on February 10, 2014). Chlorhexidine gluconate is used to treat gingivitis. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014). Naproxen is also known as Naprosyn. Id.

[25] Amoxicillin is also known as Augmentin. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014).

[26] Pyridium is used to relieve symptoms caused by irritation of the urinary tract. WebMD, http://www.webmd.com/drugs (last visited on February 10, 2014). Phenergan is an antihistamine. Id. Zithromax is also known as azithromycin. Id.

On April 6, 2011, plaintiff arrived at Christian Hospital to follow up on the previous emergency room visit.  (Tr. 676.)

On June 26, 2011, plaintiff arrived at the emergency room, complaining of urinary tract infection.  Scott M. Grupas, D.O., diagnosed urinary tract infection and prescribed Cipro and Pyridium.  (Tr. 627-48.)

On July 8, 2011, plaintiff arrived at Christian Hospital to follow up on the previous emergency room visit.  (Tr. 675.)

On August 23, 2011, plaintiff arrived at Christian Hospital and complained of urinary tract infection.  Dr. Spezia recommended a CT scan and prescribed Cipro.  (Tr. 674.)

On August 25, 2011, an abdominal CT scan revealed a lesion on the left kidney, and an adrenal mass, hepatic cysts, and uterine myomas that remained unchanged.  Dr. Vas recommended sonogram or CT scan with contrast of the kidneys.  (Tr. 671-72.)

On September 6, 2011, a CT scan of the kidneys revealed a cyst on the left kidney.  (Tr. 673.)

On September 28, 2011, plaintiff arrived at Christian Hospital for urinalysis and complained of arthritis in her right arm.  (Tr. 670.)

On October 13, 2011, plaintiff arrived at Christian Hospital.  (Tr. 667-68.)

On October 20, 2011, Dr. Spezia found that plaintiff could occasionally lift five pounds or less, stand, sit, and walk for two hours during an eight-hour workday but for only thirty minutes continuously.  He also found that she could push or pull for only one hour during an eight-hour workday and for only thirty minutes continuously.  He recommended that she recline, lie down, and elevate her legs four times per day in thirty minute intervals.  He further found that she could never bend or kneel and could only occasionally reach.  He found that plaintiff should avoid all exposure to heights, machinery, fumes, or vibration and only avoid concentrated exposure to extreme temperatures.  (Tr. 665-66.)

On December 30, 2011, plaintiff complained of stomach flu and nerve damage in her right arm.  Dr. Spezia diagnosed right arm neuropathy.  (Tr. 696.)

On January 15, 2012, plaintiff arrived at the emergency room.  Matt E. Duban, M.D., diagnosed upper respiratory infection and prescribed amoxicillin.  (Tr. 698-702.)

On January 30, 2012, the Saint Louis University Mental Status Examination indicated mild neurocognitive disorder.  (Tr. 697.)

On February 3, 2012, plaintiff arrived at Christian Hospital to follow up on upper respiratory infection.  (Tr. 695.)

**First ALJ Hearing**

The ALJ conducted a hearing on November 16, 2009.  (Tr. 31-53.)  Plaintiff testified to the following.  She lives with her son in his house.  Her son has been unemployed for three months but worked fulltime at a Shop and Save.  She graduated from high school.  She worked in sanitation at Schnucks.  She last worked on April 12, 2008.  She received unemployment benefits in 1981 or 1982.  Since December 2, 2009, she has seen Dr. Spezia but no other medical professionals, including psychiatrists and psychologists.  She is prescribed no psychiatric medications.  She measures five feet, two inches, and 275 pounds.  At the hearing, she asked the ALJ if she could stand.  (Tr. 34-38.)

She testified that she takes medication for acid reflux, which partially controls the condition.  She informed her physician that the medication does not completely control the condition.  He gave her no specific diet but informed her that he would performs tests on her.  She no longer alleges any mental impairment.  (Tr. 38-41.)

On a typical day, she awakens at 6:00 a.m., and tries to sweep the floor with her broom, which she cannot do.  Then, she makes coffee.  She sits frequently, because she cannot stand.  She cannot wash dishes due to her inability to stand.  She showers with her son's fiancée's assistance.  She cannot climb stairs.  She can sit for only about fifteen minutes before she must stand. She can stand and walk for only three minutes before she must sit.  Her son transported her to the hearing, left her at the door, and she had difficulty with the walk, which was approximately fifty feet.  After she makes coffee, she sits in her kitchen because she cannot walk to the front room.  She fills the sink with water to wash dishes and sits for fifteen minutes.  In cycles, she stands, washes as many dishes as possible, and then sits.  A chair sits immediately next to the sink.  (Tr. 41-42.)

When she finishes the dishes, she walks her dog around her small house, which takes about thirty minutes.  She must sit for about fifteen minutes before she reaches the point halfway between her front door and her backyard, which is a distance of approximately twenty feet.

Afterwards, she alternates between sitting on her couch and standing in the front room and watches television. She does not use the telephone, visit, or leave her home. Her son shops for her. In the afternoon, she naps on the couch in twenty-minute periods, which also serves as her bed. She sleeps only in intermittent twenty minute intervals during the night. Her son cooks and cleans the kitchen for her. After her afternoon nap session, she returns to the kitchen to sit for a couple hours to converse with her son as he prepares dinner. In the evening, she returns to the front room to sit. (Tr. 43-46.)

She uses the bathroom often, although the frequency varies according to her colon spasms. One day, she used the bathroom seven times solely due to her colon. Her colon spasms twice per week, and she cannot eat. She has not eaten for three days. Endometriosis forces her to wear five pads or tampons at once during menstruation, which can last for 28 days. Endometriosis caused her difficulty during her employment at the bakery, where she wore a white uniform. Her low back causes her to wake every hour. Her left leg hurts, burns, and causes paresthesia. She only lies on her right side. Lying on her left side causes burning. Her left leg condition preceded her back condition, but Dr. Spezia informed her that the conditions were related. He also informed her that her back condition would result in wheelchair confinement regardless of weight loss. She cannot extend her left arm fully. She never went to any Saint Louis University hospital but always goes to Christian Northwest near her home. (Tr. 46-51.)

**First Decision of the ALJ**

On April 21, 2009, the ALJ found that plaintiff had residual functional capacity (RFC) to perform a light work, except that she can only occasionally bend, stoop, crouch, and crawl. The ALJ further found her capable of performing her past relevant work as a donut maker. (Tr. 9-15.)

Plaintiff appealed the decision to the district court. On March 16, 2011, the district court reversed and remanded the decision because "[t]he ALJ did not make sufficient, specific findings of what physical and mental abilities were necessary to perform plaintiff's former employment as a donut maker in a bakery factory." (Tr. 472-87.)

**Second ALJ Hearing**

On remand, the ALJ held a hearing on April 9, 2012. (Tr. 418-442.) Plaintiff testified to the following. She lives with her son who also acts as her caregiver. He works at Paraguay and attends college at night. She received unemployment benefits around 1986. She measures five feet, two inches, and 280 pounds. (Tr. 421-22.)

She awakens at 7:30 a.m. Her son helps her dress and groom her hair. She studies the Bible. She can stand for only a few minutes, and sitting causes pain and burning. She washes dishes with breaks every few minutes due to the need to sit. Her 25-year old son prepares meals and cleans the house. She cannot vacuum, sweep, or mop. She sleeps on a couch. She can perform no yard work but could in 2007. Before his death, her former spouse performed the yard work. She cannot empty the trash. She uses a cane to climb the two steps by the backdoor of her house and the three steps by the front door. No physician prescribed the cane. She has three dogs, including a black Labrador retriever, an African hunting dog, and a German shepherd, but her son cares for them. Her son shops for groceries and carries them into the house. (Tr. 422-28.)

She attends church every Sunday, where she alternates between sitting and standing during the three-hour sessions. Her son drives her to church. She has a driver license but does not drive because she does not trust her reflexes. She last drove in 2007. She can only watch television for twenty minutes at a time. She reads the book of Mormon and watches the BYU channel. She can brush her teeth. She alternates between sitting and standing throughout the day and can sit for about fifteen minutes before changing positions. Rainy days cause her even more difficulty. Over the course of a day, she can sit for four hours. She can stand for only ten continuous minutes. Over the course of a day, she could stand for only two hours. Her physical condition impacts her ability to walk in a similar manner. (Tr. 428-31.)

She cannot lift a gallon of milk. She can feed herself but with difficulty. She cannot bend, stoop, kneel, crouch, or crawl. She shakes frequently. The pain and burning in her back prevents her from lifting. She worked for thirty-one years in the bakery business. She weighed 240 pounds in April 2008 and lost sixty pounds during that year. She takes Tramadol, which Dr. Spezia prescribes. She last saw a psychiatrist or psychologist in 2008. (Tr. 432-36.)

Vocational expert (VE) Delores Gonzales also testified at the hearing. Plaintiff worked as a bakery production assembler, which is medium, unskilled work; donut maker, which is medium,

semi-skilled work; and bakery supervisor, which is medium, skilled work. She has supervisory, managerial, baking skills, and possibly clerical skills. Assuming limitations to light, unskilled work, plaintiff could not perform her past relevant work. (Tr. 437-38.)

The VE testified that plaintiff could perform as an order caller, which is light, unskilled work with 41,844 positions nationally and 983 positions in Missouri; as a mail sorter, which is light, unskilled work with 25,532 positions nationally and 607 positions in Missouri; and as a hand presser, which is light, unskilled work with 49,092 positions nationally and 756 positions in Missouri. (Tr. 438.)

Plaintiff's counsel presented a hypothetical individual that assumed the limitations set forth in Dr. Spezia's October 2011 opinion. The VE responded that such individual could perform no work. Plaintiff's counsel also presented a hypothetical individual who could sit for only thirty continuous minutes and four hours total during a workday, stand and walk for only ten continuous minutes and two hours total during a workday, lift only less than ten pounds, and could never bend or stoop. The VE responded that such individual could work in a position that allowed for a sit/stand option. Plaintiff's counsel added to the hypothetical individual the inability to concentrate for more than one hour continuously and for more than four hours per day. The VE responded that such individual could perform no work. (Tr. 439-41.)

## III. DECISION OF THE ALJ

On April 19, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 403-13.) At Step One of the prescribed regulatory decision-making scheme,[27] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 12, 2008. At Step Two, the ALJ found that plaintiff's severe impairments included degenerative disc disease, obesity, and depression. (Tr. 406.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work and to understand, remember, and perform simple instructions and

---

[27] See below for explanation.

non-detailed tasks.  At Step Four, the ALJ found plaintiff capable of performing no past relevant work.  (Tr. 406-11.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 412.)

# IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the

Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to properly assess plaintiff's credibility, (2) failing to properly consider Dr. Spezia's opinion, (3) failing to support the RFC determination with substantial evidence and (4) failing to develop the record regarding plaintiff's mental condition.

### A. Credibility

Plaintiff argues that the ALJ failed to properly assess plaintiff's credibility by failing to analyze plaintiff's allegations in a sufficiently detailed manner.  Plaintiff's argument focuses on her testimony during the April 2012 hearing regarding her ability to climb stairs, lift, sit, stand, bend, stoop, kneel, crouch, or crawl.

To evaluate a claimant's subjective complaints, the ALJ must consider the Polaski factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).  The ALJ must acknowledge and consider these factors but "need not explicitly discuss each Polaski factor."  Id.  The ALJ may also consider inconsistencies in the record as a whole.  Id.  The ALJ may consider the frequency of complaints and failure to seek treatment.  Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007).   Moreover, the ALJ may consider failure to comply with medical treatment and the lack of significant medical restrictions.  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."  Id.

At the April 2012 hearing, plaintiff attributed the alleged inability to climb stairs, lift, sit, stand, bend, stoop, kneel, crouch, or crawl to her low back condition and obesity.  (Tr. 422-35.) The ALJ noted that plaintiff did not fill a prescription for prednisone given to her in August 2008. (Tr. 281.)  He further noted that although spinal MRI scans revealed multilevel degenerative

disease, they revealed no direct compression. (Tr. 167-68, 175-79.) On January 14, 2009, Dr. Mattson described plaintiff as neurologically stable, and he found her imaging studies to be unremarkable. (Tr. 165-66.) He referred her to pain management, but she missed one appointment, and the record does not reflect that she ever complied with his referral. (Id.) Moreover, since 2009, plaintiff complained of back pain on only one occasion. (Tr. 688.) Further, the ALJ noted that no medical professional has restricted plaintiff from any physical activity. (Tr. 409.)

The ALJ also noted the inconsistency in plaintiff's testimony regarding her ability to sit. (Tr. 420-36.) Further, the testimony that she could only brush her teeth and read the Bible, could not clean, prepare meals, and did not shop for groceries conflicted with her function report, which indicated that she prepared meals, shopped for groceries, laundered, and had no problems with personal care. (Tr. 223-30, 420-36.)

The court concludes that substantial evidence supports the ALJ's credibility determination and that the ALJ supported the determination with sufficiently detailed explanation. Accordingly, plaintiff's argument is without merit.

**B. Opinion of Dr. Spezia**

Plaintiff argues that the ALJ failed to afford sufficient weight to the opinion of Dr. Spezia. "[A] treating physician is normally entitled to great weight." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(1. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009).

The ALJ afforded the opinion of Dr. Spezia little weight. The ALJ reasoned that Dr. Spezia's medical notes rarely mentioned back problems, did not include any medical restrictions, and do not document clinical findings supporting his opinion. (Tr. 409.) He also noted that the Dr. Spezia's opinion conflicted with Dr. Mattson's finding of neurological stability and unremarkable imaging studies. (Tr. 409.) In contrast with Dr. Spezia's opinion, Dr. Mattson's findings had support from several imaging studies, a nerve conduction study, and ankle brachial index as well as detailed treatment notes. (Tr. 165-70, 173, 175-79, 180, 334-39.)

In sum, the ALJ discounted Dr. Spezia's opinion due to its inconsistency with Dr. Spezia's treatment notes and with Dr. Mattson's treatment notes. Accordingly, the ALJ did not err by affording the opinion of Dr. Spezia little weight.

## C. RFC Determination

Plaintiff argues that the ALJ did not support the RFC determination with substantial evidence. However, the medical evidence that supports the ALJ's credibility determination of plaintiff's pain allegations also supports the physical RFC determination. Moreover, the ALJ limited plaintiff to light, unskilled work, indicating that she found that the medical record partially supported her allegations. (Tr. 407.)

Regarding the mental RFC determination, the ALJ noted that since 2008, plaintiff had not sought psychiatric treatment and had not reported any significant mental health problems. Further, no medical professional has found plaintiff subject to any significant mental limitations; rather, shortly before she stopped seeking mental health care, Dr. Rice recommended that she return to work to improve her mental health. (Tr. 281.) Additionally, the opinion of Dr. Moreno, state agency consultant, supports the ALJ's determination that plaintiff can perform simple, unskilled work. (Tr. 378-80.)

## D. Development of the Record

Plaintiff argues that the ALJ erred by failing to order a consultative examination regarding plaintiff's mental impairments. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). It is reversible error for an ALJ not to order a consultative examination when such

evaluation is necessary for him to make an informed decision. <u>Haley v. Massanari</u>, 258 F.3d 742, 749 (8th Cir. 2001). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision. But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." <u>Naber v. Shalala</u>, 22 F.3d 186, 189 (8th Cir. 1994); <u>Tellez v. Barnhart</u>, 403 F.3d 953, 956-57 (8th Cir. 2005).

Here, the record includes plaintiff's medical records documenting regular, periodic medical treatment from 2009 through 2012, forming a significant basis for the ALJ's informed decision. Therefore, the ALJ did not err by not ordering a consultative examination.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 3. 2014.